UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 23-CR-60061-MOORE/LOUIS

UNITED STATES OF AMERICA,

 Plaintiff,
Vs.

MILES MCGOUGH,

 Defendant.
_____/

**MEMORANDUM IN AID OF SENTENCING**

 The Defendant, MILES MCGOUGH, through counsel, hereby submits the following Memorandum in Aid of Sentencing.

 I. Introduction

 Miles Mcgough is a 26-year-old young man who was sexually abused at approximately four-years-old and raped twice at approximately 12-years-old. At the age of 23, he began experiencing seizures. After eighteen months of visits to the neurologist, MRIs, EEGs, several dislocated shoulders and injures from the seizures, and—most recently—an appointment an epileptologist (a neurologist who specializes in epilepsy), Miles's seizures are still ***not*** controlled. Sadly, despite medication, Miles has experienced—on average—two seizure a week, since summer 2022. His official diagnosis is intractable (when seizures can't be controlled) epilepsy. (*See* Clinical Note by Dr. Nitish Harid, filed under seal).

Each seizure is a terrifying and traumatic event for Miles and his parents. His father was tasked with documenting Miles's seizures and the aftermath at the request of doctors, and so that Miles could receive disability. The photo below shows Miles with injuries he sustained after falling during a seizure.



The former Chief Physician and the former Assistant Director of the federal Bureau of Prisons (BOP) believe that BOP will ***not*** be able to keep Miles safe while he is incarcerated. (*See* declarations by Dr. Michael Nelson and Mr. Phillip Wise, filed under seal).

In light of the combination of Miles's unique and compelling history and characteristics—his age, history of sexual abuse, and dangerous uncontrolled medical condition—counsel requests that this Court sentence him to 188 months, which is the bottom of the sentencing guidelines. (DE 41 at ¶ 110). 188 months—15 years and 8 months—is more than sufficient to punish Miles, as well as deter others and protect

the public. *See* 18 USC § 3553(a).

   II.   <u>Due to Miles's uncontrolled epilepsy, his health will be in danger at BOP</u>

According to Dr. Michael Nelson—former Chief Physician and Chief of Health Programs for the Health Services Division of the BOP—Miles's health will likely be in danger at the BOP. Phillip Wise—former Assistant Director of BOP, with responsibility for Health Care for the agency—agrees. This is due to a number of issues that range from having a seizure while climbing stairs (epileptic inmates are not typically issued elevator passes) or falling from the top bunk to denial and delay of medical care. (Nelson at 3). Mr. Wise noted that while Miles incarcerated pre-trial at FCI Englewood in Colorado, he has seizure and dislocated his shoulder. (Wise at 5).

A problematic threshold issue is that Miles will most likely ***not*** be designated to federal medical center (FMC),[1] which is Care Level III facility. Instead, Miles will be designated to Care Level I, or more likely, a Care Level II facility. (Wise at 4). Care level designation will affect the type and quality of treatment Miles will receive. (Nelson at 11). Unfortunately, a Care Level II classification "***fails to adequately appreciate the severity and serious nature of Mr. Mcgouh's medical needs***." (Wise at 4) (emphasis supplied).

Even if he is designated to an FMC, incarceration will disrupt Miles's "continuity of care," which is "of great importance to Mr. Mcgough." *Id*. at 9. As Dr.

---

[1] Counsel intends to the request that the Court make recommend placement at an FMC, specifically FMC Rochester (*See* Wise at 5), with the hope that a recommendation from the Court will help.

3

Nelson correctly noted, "it has taken approximately 18 months of neurologist evaluations and tests to arrive at…a stepwise plan to treat Mr. Mcgough's intractable [uncontrollable] seizures." *Id*. at 9. This is the treatment plan outlined by Dr. Harid. Unfortunately, regardless of Miles's designation, "it would take several months to establish care with an appropriate specialist who would continue Dr. Harid's plan." *Id*. During those several months, Miles will continue to have frequent uncontrolled seizures. *Id*. More troubling, "continued evaluation and treatment to determine the cause of [Miles's] seizure disorder may be viewed [by BOP] as medically ***appropriate***, but not medically ***necessary***, and thereby denied. (Wise at 6) (emphasis supplied).

Moreover, regardless of the facility designation, "***BOP does not have a clinical practice guideline for the management of seizures***." (Nelson at 12) (emphasis supplied). Without a clinical practice guideline, the quality of care that Miles will receive for his epilepsy will depend on the experience of his assigned providers and their personal motivation to research medical issues. *Id*. This is far from a sure thing.

Further, recruitment and retention of health care providers has been a challenge since the 1980s. *Id*. at 14. And because of "staff augmentation," a medical staff member may be forced to manage an inmate housing unit, instead of proving medical care to someone like Miles. (Nelson at 13-14) (Wise at 7). Moreover, staff vacancy rates—currently at 35%—means there are fewer officers available for escorted medical trips into the community. *Id*. at 13.

4

As stated, Miles will require treatment by a neurologist. At a Care Level I or II facility, it will be incumbent on BOP to take Miles outside the facility to see a neurologist or any other specialist. A visit with an outside specialist requires a review process. (Nelson at 13). But conducting the review process can delay necessary consultations and tests by ***weeks to months***, or worse—treatment by an outside specialist can be denied. *Id.*

Dr. Nelson and Mr. Wise summarized that Miles's uncontrolled seizures have several potential consequences at BOP: delayed medical care, denial of medical care, increased risk of injury, and possible victimization by other inmates. *Id.* (Wise at 3). In Dr. Nelson's opinion, "***these risks cannot be mitigated in any BOP setting, including a Federal Medical Center***." *Id.* at 16 (emphasis supplied). Dr. Nelson cautioned that "alternatives to incarceration are the best option to decrease the risks to Mr. Mcgough, and to avoid liability to the Bureau of Prisons and its staff." He strongly recommended that Miles be allowed to continue his treatment plan with Dr. Harid, until his seizures are under control with medication and/or surgery. *Id.* at 16.

Dr. Nelson and Mr. Wise are clear. Due to his uncontrolled epilepsy, Miles will confront of a host of obstacles—both expected and unimaginable—at the BOP. Because of Miles's age, the length of time he has been experiencing seizures, and the fact that they are uncontrolled, Miles is also at risk of SUDEP—sudden unexpected death in epilepsy.[2] (Harid, at 8). Simply put, for Miles, prison will be a type of

---

[2] https://www.cdc.gov/epilepsy/communications/features/sudep.htm#:~:text=SUDEP%20is%20not%20well%20understood,1

punishment not intended by the Court or the government: his health—and even his life—will be in danger every day.

### III. Miles's age, trauma, and relevant background

When Miles was only 16-years-old, he was diagnosed depression, anxiety, and post-traumatic stress disorder (PTSD). His depression and anxiety crept in when he was about 13 or 14 years old. The diagnosis stemmed from his delayed report to a school guidance counselor: he had been sexually abused. It was the first time he spoke about it. When he was between the ages of 3 and 5, a staff member at his church's daycare center sexually abused him. Then, when he was in middle school, he was raped by two separate individuals: a friend's mother and a male family member.

Miles coped with the anxiety and depression by drinking alcohol and smoking marijuana. As he has stated, the substances "made the bad feelings go away." He often felt hopeless. He is currently prescribed Prozac for depression and anxiety. (Harid at 10). He attempted suicide on three occasions: twice—before the seizures began—by swallowing pills that he subsequently vomited and once in 2022—after the seizures started—with a gun, that fortunately misfired. He kept the bullet as a reminder to value his life. Unfortunately, "anxiety is well-established potential trigger for seizures," and "incarceration will increase his stress and anxiety, making seizures more likely." (Nelson at 7, 15).

One bright spot came when Miles's found a career. After high school, he completed vocational school and met the educational, licensing, and apprentice

6

requirements to become a Master Plumber[3]. He had worked as a plumber during the summers in high school. His career and the daily work brought him joy, purpose, and confidence. He bought a house. But then the seizures began.

Miles had to stop driving. He must be seizure-free for three to six months before he can operate a vehicle. (Harid, at 8). Sometimes Miles doesn't go three days without a seizure. For months, his parents drove him to work. But he wasn't able to enter tight crawl spaces or operate heavy machinery, which are both necessary for the job. He kept having seizures at work, which on two occasions resulted in a transport to the emergency room. In August of 2022, he gave up his career. He applied and qualified for disability. (DE 41 at ¶s 90, 91).

Notably, Miles experienced his first seizure in 2020—an absence seizure[4]—at 23 years old. Absence seizures affect the frontal lobe of the brain, which manages executive function[5]. In late 2021, he experienced his first focal seizure, a seizure that affects one part or lobe of the brain[6]. Over time, focal seizures can lead to memory

---

[3] A master plumber is a person who has earned the highest professional level of plumbing. To become a master plumber, you must complete an apprenticeship, become a licensed journeyman, and earn a master plumber's license. A master plumber installs, maintains, and repairs systems in a highly skilled manner that exceeds the expertise of regular plumbers. S/he is responsible for maintaining and repairing both outdoor and indoor plumbing issues.

[4] A seizure involving a brief, sudden lapse of consciousness lasting from approximately 10 to 30 seconds. https://www.mayoclinic.org/diseases-conditions/petit-mal-seizure/symptoms-causes/syc-20359683

[5] https://www.health.qld.gov.au/abios/asp/bfrontal#:~:text=The%20frontal%20lobes%20are%20important,order%20to%20achieve%20a%20goal.

[6] https://www.hopkinsmedicine.org/health/conditions-and-diseases/epilepsy/focal-epilepsy

problems or issues with thinking ability.[7] Then, in January 2022, one month before his 25th birthday, he suffered his fist tonic-clonic seizure, which affects the entire brain. The instant offense conduct began that same year, 2022.

Research in psychology and neuroscience reveal that the "adolescent brain" does not fully mature and develop until the mid to late 20s.[8] *See generally* Steinberg, Laurence, Ph.D. (2014). *Age of Opportunity*. New York, New York: Houghton Mifflin Harcourt Publishing Company. The part of the brain that is last to develop is the pre-frontal cortex; this area is responsible for skills like planning, prioritizing, and making good decisions.[9] Notably, the frontal cortex—which includes the pre-frontal cortex[10]—is a common area involved in seizures.[11]

The legal system is beginning to reflect to the science, which reveals that—though the legal age of adulthood is 18—individuals are still children in terms of culpability in their 20s. As one example, in 2021, the District of Columbia—recognizing these revelations in brain development—amended its Second Look Act, which now allows for anyone who committed a crime **before the age of 25** to seek review of their sentence after they have served 15 years. The Second Look Act

---

[7] https://my.clevelandclinic.org/health/diseases/22893-focal-seizure
[8] National Institute of Health (NIH) https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know#:~:text=Adolescence%20is%20an%20important%20time%20for%20brain%20development.&text=The%20part%20of%20the%20brain,prioritizing%2C%20and%20making%20good%20decisions (last viewed December 1, 2023).
[9] *Id*.
[10] https://neuroscientificallychallenged.com/posts/know-your-brain-prefrontal-cortex#:~:text=The%20prefrontal%20cortex%20is%20the,front%20of%20the%20premotor%20cortex.
[11] https://www.ncbi.nlm.nih.gov/books/NBK580614/

previously only afforded this opportunity to individuals who committed a crime ***before they were 18 years old***.[12] Thus, it's worth noting that around the time of the instant offense, Miles's brain was most likely not fully developed and he was experiencing seizures, which affect the brain.

IV. Conclusion

One hundred and eighty-eight months—the bottom of the guidelines—fulfills the overarching requirement of 18 U.S.C. § 3553 to impose a sentence that is sufficient, but no greater than necessary, to achieve the purposes of sentencing. Indeed, Miles's age, history of sexual abuse, and serious uncontrolled medical condition are exactly the type of "history and characteristics" that § 3553 requires courts to consider to arrive at a reasonable, sufficient sentence for each individual defendant.

In fact, Miles's medical condition and the severe risks to his health—and life— the he will face at BOP is contemplated by the sentencing guidelines themselves. *See* U.S.S.G. § 5H1.4 (Physical condition may be relevant in determining whether a departure is warranted, if the condition, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.). Stated plainly, for Miles Mcgough, 15 years and eight months of incarceration is enough punishment, both for Miles and for the community.

---

[12] https://www.pdsdc.org/resources/client-resources/second-look-amendment (last viewed October 26, 2023)

WHEREFORE, it is respectfully requested that this Court take into consideration the foregoing in determining an appropriate sentence in this matter.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By: /s/ Ashley Kay
Ashley Devon Kay
Assistant Federal Public Defender
Florida Bar No: 78991
150 W. Flagler Street, Suite 1700
Miami, Florida 33130
(305) 530-7000
ashley_kay@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on December 4, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document was served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Ashley Kay